(No. 65586.—

ADVANCED SYSTEMS, INC., *et al.*, Appellants, v. J. THOMAS JOHNSON, Director of Revenue, *et al.*, Appellees.

*Opinion filed February 2, 1989.—Rehearing denied April 3, 1989.*

488

CALVO, J., took no part.

Lee J. Schwartz, of Sidley & Austin, Martin S. Katz, of Fisk & Kart, Ltd., and William F. Dart, all of Chicago, and William A. Price, of Wheaton, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Michael J. Wynne, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE WARD delivered the opinion of the court:

The plaintiffs, Advanced Systems, Inc., and other property taxpayers, appeared at a public hearing conducted by the Department of Revenue (Department) on the 1985 estimated multiplier for Cook County to object that the multiplier was too high. A hearing officer overruled their objections and the Director of the Department certified a multiplier of 1.8085 for 1985. The circuit court, on administrative review (Ill. Rev. Stat. 1985, ch. 120, par. 619; ch. 110, par. 3—101 *et seq.*) affirmed the Department's determinations. We granted the plaintiffs' motion for direct review to this court under our Rule 302(b) (107 Ill. 2d R. 302(b)).

Taxes on real property in our State are to be levied uniformly by valuation. (Ill. Const. 1970, art. IX, §4(a).) Except in counties with a population of more than 200,000, which classify real property for purposes of taxation, real property is to be valued or assessed at 33⅓% of its fair cash value. (Ill. Rev. Stat. 1985, ch. 120, par. 501.) The Department is directed to equalize assessments between our State's 102 counties so that the assessed valuation of real property in each county will, in aggre-

gate, be at the specified level of 33⅓% of its fair cash value. (Ill. Rev. Stat. 1985, ch. 120, par. 627.) To equalize the property values between counties, the Department annually calculates an equalization factor, or "multiplier," to be applied to the aggregate assessed valuation of property in each county. In other words, the multiplier may raise or reduce the aggregate assessed valuation of property within a county to meet the statutory level of 33⅓% of fair cash value. Ill. Rev. Stat. 1985, ch. 120, pars. 627, 630.

The plaintiffs, as stated, objected at a public hearing in July 1986 conducted by the Department, as mandated by section 148a (Ill. Rev. Stat. 1985, ch. 120, par. 629a), to the estimated 1985 multiplier as being too high. After the hearing, the Department did not alter its estimated multiplier of 1.8085, but certified that figure as its final determination. On administrative review, the trial court found for the Department. Taxes were extended by the county based on the equalized assessed valuation produced by application of the multiplier. See Ill. Rev. Stat. 1985, ch. 120, par. 632.

The plaintiffs raise numerous objections to the equalization process used by the Department to calculate the 1985 multiplier for Cook County. As the trial court observed, "The taxpayers' strategy, in its excellent legal craftsmanship, was to employ a high-powered caliber Howitzer in its assault upon the determination of the multiplier." The arguments, happily, may be grouped into three categories for disposition: (1) the law providing for the multiplier is invalid as a violation of the "single subject" requirements of the 1870 and 1970 Illinois Constitutions; (2) the Department failed to exercise "considered judgment" in setting the 1985 multiplier; and (3) the Department failed to follow the Administrative Procedure Act, and also violated the taxpayers' due process rights: (a) in setting procedures for its sales-ratio

studies; (b) in setting the multiplier; and (c) in the manner it conducted the hearing and decisionmaking process on the multiplier.

## I. THE VALIDITY OF THE MULTIPLIER LAW

The plaintiffs contend that the provision of the Revenue Act of 1939 establishing the multiplier (Ill. Rev. Stat. 1985, ch. 120, par. 627) is invalid as violative of the requirements of the Illinois Constitutions of 1870 and 1970 that an act of the legislature must have a title and single subject matter. (Ill. Const. 1870, art. IV, §13; Ill. Const. 1970, art. IV, §8(d).) As the plaintiffs correctly note, legislation enacted while the 1870 Constitution was in force and before the 1970 Constitution was adopted must be valid under both constitutions. *People ex rel. Hanrahan v. Caliendo* (1971), 50 Ill. 2d 72, 76.

The 1870 Constitution provided:

"No act hereafter passed shall embrace more than one subject, and that shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed." Ill. Const. 1870, art. IV, §13.

The 1970 Constitution has a parallel provision, stating: "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." Ill. Const. 1970, art. IV, §8(d).

The full title of the Revenue Act of 1939 states:

"An Act to revise the law in relation to the assessment of property and the levy and collection of taxes, and to repeal certain Acts herein named." Ill. Rev. Stat. 1985, ch. 120, par. 482.

The plaintiffs say the provisions of the Revenue Act that establish the multiplier are outside the scope of the title of the Act. The plaintiffs say that equalization is beyond the scope of the Act's title, as it is neither the levy

nor collection of taxes, and equalization is a separate function from the assessment of property taxes. If the legislature chooses a specific title, as the plaintiffs claim it did here, then provisions that are not within the scope of the specific subject chosen are not included in the Act. The equalization process, the plaintiffs acknowledge, is part of the whole property tax process, but they contend the title of the Revenue Act "is more limited than the whole field of property taxation" and, thus, excludes equalization.

The Department responds that a prior decision of this court, *People ex rel. McDonough v. Beemsterboer* (1934), 356 Ill. 432, addressed the same constitutional challenge, as raised against the Tax Commission Act of 1919, and is dispositive here. The Act at issue in *Beemsterboer* was the predecessor of the Revenue Act of 1939. It was entitled, "An act in relation to the assessment of property for taxation." It was contended there that the Act violated the 1870 Constitution's requirement that each legislative act embrace only one subject, as it contained more than one subject and included a subject not expressed in the title. The court rejected the contention, stating, "The act deals with the powers and duties of the tax commission with reference to the assessment of property, its power to order reassessments, *the procedure to be followed and the procedure in equalizing assessments.* All these matters relate to the assessment of property for taxation and are embraced within the subject of the enactment expressed in the title." (Emphasis added.) 356 Ill. at 436.

We consider that the title of the Revenue Act is general enough to include equalization without violating the constitutional mandate of one subject per legislative act under both the 1870 and 1970 Constitutions. Many comprehensive acts, as the court noted in *Beemsterboer*, have general titles with numerous provisions not ex-

pressed in the title, but the title is sufficient "when they are related and have some connection, more or less direct, with the subject of the legislation." (356 Ill. at 436.) Legislation does not run afoul of the subject requirements of the 1870 Constitution's section 13 of article IV if the subjects covered by the Act are germane to it and fall within the general designation. (*Rouse v. Thompson* (1907), 228 Ill. 522, 533; *Sutter v. People's Gas Light & Coke Co.* (1918), 284 Ill. 634, 642.) There is a common purpose expressed by the various provisions of this act toward the single subject of real property taxation. Equalization is distinct from assessment, but both are part of the real property taxation system set up by the Revenue Act. Assessment is performed by the local assessor within each county (see Ill. Rev. Stat. 1985, ch. 120, par. 511 *et seq.*), while equalization is a statewide process, performed by the Department, to adjust the aggregate assessed valuations of each county to a level at which property is taxed uniformly throughout the State. By statute, taxes are not extended within a county until after the Department certifies the multiplier to be used in each county. (Ill. Rev. Stat. 1985, ch. 120, par. 632.) Assessment, then, is the valuation of individual properties, while equalization is the valuation of the properties collectively within a county. (See, *e.g., People ex rel. Tennyson v. Texas Co.* (1950), 406 Ill. 120.) The title of the Act complies with the constitutional mandate, as it fairly points to the subject matter of the Act.

## II. CHALLENGES TO THE DEPARTMENT'S METHODOLOGY

The plaintiffs advance eight statistics-based arguments to support their contention that the Department failed to exercise "considered judgment," as required by section 148a, in setting the 1985 multiplier. In the plaintiffs' view, the Department set the multiplier through a

"mechanical production," ignoring the plaintiffs' arguments that the Department's samplings, procedures and estimates "were inaccurate, incomplete, and ill-considered." An explication of the statutory requirements is necessary to address the plaintiffs' arguments.

Section 146 of the Revenue Act sets forth the procedure the Department is to use in calculating the multiplier for each county. (Ill. Rev. Stat. 1985, ch. 120, par. 627.) The Department is mandated to compare the assessed valuations, "as revised by boards of review or boards of appeals, as the case may be," to the estimated 33⅓% of the fair cash value of the property, which is to be "established through the analysis of property transfers, property appraisals, and such other means as [the Department] deems proper and reasonable." (Ill. Rev. Stat. 1985, ch. 120, par. 627.) From this comparison, the Department is to determine the percentage relationship between the property valuations as set by the county assessors and the estimated 33⅓% of the fair cash value of the property.

After determining this ratio, "the Department shall then ascertain the percentage to be added to or deducted from the aggregate reviewed assessment on property *** in order to produce a ratio of assessed to 33⅓% of the fair cash value equivalent to 100%." (Ill. Rev. Stat. 1985, ch. 120, par. 627.) This complicated process has further intricacies in Cook County, which is permitted by the Constitution of 1970 (Ill. Const. 1970, art. IX, §4(b)), to classify property for purposes of taxation. Each classification of property has its own level of assessment, varying between 16% and 40% of market value. As such, for Cook County, the Department determines the median level of assessment for the major classes of property and for the subclasses within one class. After these amounts are determined, the Department calculates an overall county weighted median level of assessment.

The method for determining the median level of assessments, known as the "sales ratio study," is set out in section 1(20) of the Act:

"The term '33⅓%' means 33⅓% of the actual value of real property, as determined by the Department's assessment to sales ratio studies for the 3 most recent years preceding the assessment year, adjusted to take into account any changes in assessment levels implemented since the data for such studies were collected. In compiling such sales ratio studies the Department shall exclude from the reported sales price of any real property any amounts included for personal property and sales finance charges." Ill. Rev. Stat. 1985, ch. 120, par. 482(20).

The source of data for the Department's sales ratio studies are declaration forms (known as "green sheets") that are required by section 3 of the Real Estate Transfer Tax Act for each transfer of property. (Ill. Rev. Stat. 1985, ch. 120, par. 1001 *et seq.*) The green sheets, to be filed with the county's recorder of deeds, must report, *inter alia*, the full consideration for the property transferred, the legal description of the property, and information as to whether the transfer is between relatives or is a compulsory transaction. (Ill. Rev. Stat. 1985, ch. 120, par. 1003.) The recorder of deeds transfers the green sheets to the county assessor, who inserts the most recent assessed value for the transferred property and transmits the forms to the Department at least once monthly. (Ill. Rev. Stat. 1985, ch. 120, par. 1003.) The Department, to compute the average median level of assessment upon which the 1985 multiplier was based, used sales ratio studies for the three preceding years— 1982, 1983, and 1984.

The plaintiffs contend the methodology used by the Department was improper, as the Department refused to supplement its samples of sales prices, obtained from the

green sheets, with appraisals of the property. The plaintiffs view section 146 as placing a statutory duty upon the Department to supplement the sales price information with appraisals of property. This court, in *Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 539-40, rejected a contention that the Department's failure to use property appraisals violated section 146 as well as accepted assessment standards. Under section 146, the Department is directed to ascertain the median level of assessment in each county through "analysis of property transfers, property appraisals, and such other means as it deems proper and reasonable." This court held in *Airey* that the statute requires only that the Department "use such means as it deems proper and reasonable." A statutory provision, it was held, is generally directory if it " 'merely directs a manner of conduct for the guidance of the officials.' " (*Airey*, 116 Ill. 2d at 540, quoting *Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 21.) "The direction to use property appraisals is plainly such a guideline." *Airey*, 116 Ill. 2d at 540.

Despite our decision in *Airey* that the statute does not require the Department to use appraisals to ascertain the median level of assessment, the plaintiffs contend that appraisals are necessary for the Department to exercise "considered judgment" in setting the multiplier. The plaintiffs base their contention on section 148a of the Act, which requires the Department to hold a hearing at which all interested parties may submit their arguments in support of or adverse to the Department's estimated multiplier and further provides that the Department, shall, after the hearing, "either confirm or revise such estimate *so as to correctly represent the considered judgment* of the Department respecting the estimated percentage to be added to or deducted from the aggregate assessment." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 120, par. 629a.) The plaintiffs contend

they have demonstrated that the Department's exclusive reliance on sales ratio studies in Cook County prevents uniformity in equalization and leads to an artificially inflated multiplier.

We consider that the Department correctly states that the plaintiffs are attempting to impose the use of property appraisals in the equalization process where neither statute nor "considered judgment" requires it. In ascertaining the legislative intent, we look first to the language of the statute and, if the legislature's intent may be ascertained from the language it used, it will be given effect without resort to other aids in construction. (*Conner v. Copley Press, Inc.* (1984), 99 Ill. 2d 382, 387; *Interlake, Inc. v. Industrial Comm'n* (1983), 95 Ill. 2d 181, 192.) Where the terms of a statute are not defined by the legislature, as we have here, it will be assumed that they were intended to have their ordinary and popularly understood meaning, unless to do so would defeat the perceived legislative intent. (*People v. Fink* (1982), 91 Ill. 2d 237, 240.) The term "considered judgment" is self-explanatory; it denotes the granting of a discretion or latitude of decision by the legislature to the Department in deciding whether the estimated multiplier is correct. The legislature, then, intended that the Department would have discretion to either confirm or revise its estimated multiplier after listening to the arguments and proofs of interested parties at the public hearing. The statute does not *require* the Department to modify or revise the estimated multiplier after the public hearing, but states the Department may modify or revise it if to do so would correctly represent the Department's considered judgment. For this court to determine that appraisals are required in order for the Department to exercise its "considered judgment" would ignore that the legislature has granted the Department discretion in setting the multiplier. It could not be simply a mechanical calculation.

Too, appraisals are intended to estimate the fair cash value of a particular property if it were to be sold. Appraisals, as the plaintiffs note, typically value property from the "income approach," which considers the amount of ongoing revenue the property may generate for the buyer or seller, and the "cost approach," which considers the cost of reproducing a comparable new property. The Cook County assessor uses all three methods to calculate assessments. The best indication of the fair cash value of the property is the actual sales price obtained rather than an appraisal of its worth.

The plaintiffs presented no evidence that the transfers were not representative of sales of the different classes of property. While the plaintiffs presented expert testimony at the hearing recommending the appraisal method, this court held in *Airey* that the Department was free to reject such recommendations. Nothing in the plaintiffs' evidence that a majority of States use appraisals in establishing property values suggests that the Department's sales ratio method is not a proper and reasonable means of determining assessed valuation. As was stated in *Airey*, the statute requires "only that the Department 'use such means as it deems "proper and reasonable" ' " to make its studies in assessed valuations. (*Airey*, 116 Ill. 2d at 540, quoting *People ex rel. Wenzel v. Chicago & North Western Ry. Co.* (1963), 28 Ill. 2d 205, 216.) We judge the Department's use of property transfers alone was proper and reasonable in calculating the 1985 Cook County multiplier.

The plaintiffs also contend that the Department failed to stratify Class 5 property, thereby distorting the sales ratio for that class and artificially inflating the multiplier. The Department subdivides property in Class 5 and computes a median sales ratio for Class 5—93 (industrial property) and a separate median sales ratio for the remaining Class 5 properties. The plaintiffs argue that the

Department, to exercise its considered judgment, should have computed ratios separately and weighted them according to the total subgroup valuation.

This court rejected the plaintiff's argument in *Airey* that the Department's failure to stratify its samples adequately rendered the studies unrepresentative and statistically invalid. The hearing officer had noted here that one reason the Department does not stratify beyond the major classes of property and the one subclass is that the sample sizes would be very small and this "overstratification" would likely yield less statistically reliable results. The testimony of the plaintiffs' own expert supported the hearing officer's theory. This court stated in *Airey*: "We believe that the decision on how to stratify its sales ratio studies is properly committed to the Department's discretion. We are not persuaded that the Department's calculations resulted in statistically invalid sales ratio studies." (*Airey*, 116 Ill. 2d at 544.) We consider that the same must be said here.

The plaintiffs' next challenge to the Department's methodology focuses on how the personal property valuations on the green sheets are used in the assessment process. The plaintiffs say the Department failed to exercise considered judgment because it did not adjust assessment values of Class 2 (single-family residential) property and Class 5—17 (single-story commercial property) and similar Class 5 properties, despite the plaintiffs' expert testimony that personal property and goodwill are regularly included in such transfers but are not recorded on the green sheets. To exercise considered judgment in this area, the plaintiffs say the Department must investigate beyond the green sheets to determine whether the transfer of personal property is accurately reported. The Department responds that the plaintiffs presented no evidence at the hearing regarding improper

reporting of personal property on the green sheets used in the Department's sales ratio study.

As the trial court observed, the identical arguments were rejected by this court in *Airey*. It is a misdemeanor to falsify information required to be reported on the green sheets under the Real Estate Transfer Tax Act. (Ill. Rev. Stat. 1985, ch. 120, par. 1005.) As we stated in *Airey*, "while verification of this information might be preferable, the statutes do not require it. Further confirmation could also be extremely burdensome on the Department." (*Airey*, 116 Ill. 2d at 542.) The plaintiffs have presented no arguments or evidence that persuade us that the decision in *Airey* is incorrect or should be different here based on the plaintiffs' arguments concerning the exercise of the Department's considered judgment.

The plaintiffs next contend that the Department rejected numerous categories of property from its sales ratio studies, creating unrepresentative samples of properties sold. The Department's samples are comprised of parcels sold within the county during the three years preceding the assessment year. The Department removes or "edits" transactions that are not made at "arm's length" or do not convey all the rights to the property. The plaintiffs say the Department makes a "blanket exclusion" of 27 different types of property transfers rather than exercising considered judgment to determine whether a sale is acceptable. In a related argument, the plaintiffs contend the Department has failed to evaluate the effects of the exclusion of these properties on the sales ratio studies. The Department responds that it follows editing procedures accepted by professional statisticians and the professional assessing associations.

Among the types of property sales edited out are those in which the full interests in the property are not transferred, such as through limited warranty deeds and quitclaim deeds. The Department edits out property

transfers in which it appears the sales were not made at arm's length, but rather some compulsion was involved, such as transfers resulting from judicial orders and transfers to government agencies and public utilities. The hearing officer, in her lengthy report, detailed reasons for each type of property transfer that is excluded. She reports that the criteria for exclusion are based on the Department's experience and in accordance with generally accepted principles in the sales ratio field. The Department has shown good reason to reject these types of sales that occur under special circumstances as not indicative of the true market value of the properties. Its practice of strictly adhering to these editing procedures is consistent with standard practices in assessment-ratio studies and cannot be considered a failure to exercise considered judgment in the equalization process.

The plaintiffs contend too that the 1985 multiplier is improperly inflated because the Department adjusted sales prices for creative financing in 1983 and 1984, but not for 1982. Again, this question was raised and rejected in *Airey* because information on creative financing was not required by the Real Estate Transfer Tax Act to be reported on the green sheets, and thus was not available prior to January 1, 1983. 116 Ill. 2d at 541.

The plaintiffs also say the Department failed to "time-trend" its property sales figures so that property sold later in the year appears to be underassessed, compared to the same property sold earlier in the year, simply as a result of inflation. The Department responds that it follows the legislature's definition of 33⅓% of assessed valuation set out in section 1(20) of the Act (Ill. Rev. Stat. 1985, ch. 120, par. 482(20)), which does not call for time-trending of property sales used in the sales ratio studies. The statute defines 33⅓% of actual value as the Department's assessment to the sales ratio studies for the three years preceding the assessment year,

with specified adjustments and exclusions. That definition clearly does not require the time-trending approach advocated by the plaintiffs, nor do we consider that such calculations are required in order for the Department to exercise its considered judgment. Such calculations, involving each and every sale in the three-year samples, would obviously impose a major burden on the Department, which is required to equalize assessments in all 102 counties within our State before taxes are extended.

The final argument challenging the Department's methodology concerns the measure of central tendency used by the Department in its sales ratio studies. The plaintiffs say the Department should use a weighted mean, in which the transfers are weighted according to sales price, as the appropriate measure of central tendency in its sales ratio studies. The Department uses an array median as the measure of central tendency, which is the middle value in the whole ranking of the ratios. The hearing officer noted that the International Association of Assessing Officers regards the median assessment ratio as the generally preferred measure of central tendency in a stratum. She reported that the array median will be consistently closer to the typical level of assessment than the weighted mean, which is more strongly influenced by a single large transaction or by other extremes. We consider that the Department's use of the array median to measure central tendency is a proper and reasonable exercise of its discretion.

### III. APPLICABILITY OF THE ADMINISTRATIVE PROCEDURE ACT AND DUE PROCESS CHALLENGES

The plaintiffs next contend that the multiplier is invalid because the Department failed to follow the Illinois Administrative Procedure Act (APA) (Ill. Rev. Stat. 1985, ch. 127, par. 1001 *et seq.*) and also violated the due

process rights of taxpayers. The plaintiffs advance 10 specific arguments to support their contention that the Department did not follow the APA and violated the due process rights of the taxpayers. They contend the Department failed to: (1) adopt rules relating to its sales ratio studies and its determination of the multiplier; (2) adopt rules relating to the conduct of the hearing on the multiplier; (3) issue subpoenas to persons to appear and testify at the hearing; (4) place witnesses under oath at the hearing; (5) provide plaintiffs access to all relevant documents through discovery-type procedures; (6) provide an unbiased hearing officer; (7) have its Director independently review the hearing officer's recommendations; (8) allow comment on the hearing officer's report prior to setting the final multiplier; (9) certify a final multiplier; and (10) exercise its considered judgment.

Section 148a of the Revenue Act requires the Department to publish its estimated multiplier (known as the "tentative multiplier") in a general circulation newspaper within the particular county and give notice of the hearing to the public in the same newspaper publication. The section further provides that the Department may exercise its considered judgment to either confirm or revise its estimated multiplier, "after giving such hearing to all interested parties and such opportunity for submitting such proofs and arguments in support of or adverse to such estimate *as the Department considers requisite.*" (Emphasis added.) Ill. Rev. Stat. 1985, ch. 120, par. 629a.

The underlying premise for the plaintiffs' contention that the APA applies to a multiplier hearing is that such a hearing is a "contested case" within the meaning of the APA. The definition of "contested case" is set out in section 3.02 of the APA:

> " 'Contested case' means an adjudicatory proceeding, *not including rate making, rule-making, quasi-legislative,*

*informational or similar proceedings*, in which the individual legal rights, duties or privileges of a party are required by law to be determined by an agency only after an opportunity for hearing." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 127, par. 1003.02.

The Department says the hearing it conducts on the tentative multiplier is not governed by the APA, as the hearing is not a "contested case" within the meaning of section 3.02. It says taxation is a legislative function and the determination of the multiplier is a legislative fact, rather than an adjudication of individual rights. As a determination of legislative fact, the Department considers that the hearing is properly classified as that is in the nature of "rule making, quasi-legislative, informational or similar proceedings" that are excepted in section 3.02 from the definition of a "contested case." As such, the Department contends the hearing falls outside the definition of a "contested case" under the APA.

The Department also contends that section 2 of the APA shows that a multiplier hearing is exempt from the applicability of the APA, as it states: "Where the Act creating or conferring power on an agency establishes administrative procedures not covered by this Act, such procedures shall remain in effect." (Ill. Rev. Stat. 1985, ch. 127, par. 1002.) The Revenue Act, which the Department says creates or confers power on the Department to set the multiplier, provides in section 148a specific procedures concerning notice of the hearing by publication two weeks prior to the hearing date. The Department notes that section 148a also provides for how the hearing is to be conducted, as it states that all interested persons shall have an opportunity to submit proofs and arguments in support of or adverse to the estimated multiplier before the Department decides whether to increase or decrease the estimated multiplier. The section, the Department contends, also establishes the procedure

for the decision to issue within 30 days of the hearing's conclusion while, section 151 (Ill. Rev. Stat. 1985, ch. 120, par. 632) provides for the Department's issuance of the certified multiplier to the county clerk. Because these portions of the Revenue Act provide specific procedural guidelines for the multiplier hearing, the Department contends section 2 of the APA defers to these procedures and exempts the Department from promulgating rules for the conduct of the hearing. The Department also says, in response to the plaintiffs' due process arguments, that section 148a accords all process due under law to the Department's determinations.

We consider that the Department is correct in its contention that the multiplier hearing is not a "contested case" within the meaning of the APA and that section 148a adequately provides due process protection to taxpayers interested in challenging the tentative multiplier. The levy of taxes is a legislative, rather than a judicial, function vested in the General Assembly by specific grant in our State constitution (Ill. Const. 1970, art. IX, §4(a)). The legislature has the authority to delegate the taxation function and has done so, through section 146 of the Revenue Act, by designating the Department to act as the equalizing authority. While the legislature has required the Department, through section 148a, to hold a public hearing on its estimated multiplier, it has delegated a great deal of discretion to the Department on how the hearing is to be conducted. The section provides that the Department, in its considered judgment, may either confirm or revise its estimated multiplier "after giving such hearing to all interested parties and such opportunity for submitting such proofs and arguments in support of or adverse to such estimate *as the Department considers requisite.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 120, par. 629a.) The Department, then, is granted discretion to hear the taxpayers' arguments and

proofs to the extent that it considers requisite in order for it to reach a decision on whether to revise or confirm its estimated multiplier. The Department's determination of the multiplier is a legislative function, and the required hearing is intended, from what is stated in section 148a, to be an information-gathering forum in pursuit of legislative facts. As such, the nature of this required hearing is similar to a rulemaking or informational proceeding, excepted from the APA's definition in section 3.02 of a "contested case."

As the Department correctly maintains, a distinction is drawn in the administrative law area on the type of hearing that is necessary to meet due process requirements in determining legislative facts as opposed to adjudicative facts. Trial-type procedures, including the taking of evidence subject to cross-examination, are required when individual interests are at stake and specific facts are in dispute. (See, *e.g., United States v. Florida East Coast Ry. Co.* (1973), 410 U.S. 224, 35 L. Ed. 2d 223, 93 S. Ct. 810; 2 K. Davis, Administrative Law §§12.2, 12.3, at 409-13 (2d ed. 1979).) The Supreme Court has stated that there is "a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Florida East Coast Ry. Co.* (1973), 410 U.S. 224, 245, 35 L. Ed. 2d 223, 239, 93 S. Ct. 810, 821.

Due process in the equalization/assessment context, the Court has held, accords a landowner protesting the amount assessed against his *own* property the right to present his arguments at a hearing, while no hearing at all is required prior to a decision by State taxing officials to increase the valuation of *all* properties within a city. (See *Londoner v. City & County of Denver* (1908), 210 U.S. 373, 52 L. Ed. 1103, 28 S. Ct. 708; *Bi-Metallic In-*

*vestment Co. v. State Board of Equalization* (1915), 239 U.S. 441, 60 L. Ed. 372, 36 S. Ct. 141.) The former situation requires a hearing, as a small number of persons are affected on individual grounds based on a particular set of disputed facts that were adjudicated, while the latter situation involves all property taxpayers in the city and the determination is based on general facts affecting everyone. As we noted previously, the equalization process, intended to insure the constitutionally required uniformity of taxes on real property among our State's 102 counties, affects property collectively within a county. The Department is prohibited by the Revenue Act from revising or changing "any *individual* assessment made by any local assessment officer." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 120, par. 633.) No individual rights are at stake at the multiplier hearing.

Having determined that the Department's multiplier hearing is not a "contested case" within the meaning of the APA, we conclude that sections of the Act that plaintiffs draw upon to invalidate the multiplier are not applicable. Too, as the Department adjudicates no individual rights at the hearing, but attempts only to set an equalization factor affecting all properties within the county, we deem that the due process rights of the taxpayers are adequately recognized and secured in section 148a of the Revenue Act. Section 148a also provides administrative procedures not covered by the APA such that those procedures in section 148a remain.in effect, as provided in section 2 of the APA. As such, the plaintiffs' various contentions that the multiplier is invalid because the Department failed to follow the APA, which assumes the applicability of the APA to this type of hearing, must be rejected. Thus, we reject the plaintiffs' arguments that the multiplier is invalid because the Department failed to (1) adopt rules relating to its sales ratio studies and its determination of the multiplier; (2) adopt rules relating

to the conduct of the hearing on the multiplier; (3) issue subpoenas to persons to appear and testify at the hearing; (4) place witnesses under oath at the hearing; (5) provide plaintiffs access to all relevant documents through discovery-type procedures; (6) have its director independently review the hearing officer's recommendations; (7) allow comment on the hearing officer's report prior to setting the final multiplier; and (8) exercise its considered judgment.

We next address the plaintiffs' two remaining due process arguments: that the Department failed to provide an unbiased hearing officer and failed to certify a final multiplier. At the hearing, the plaintiffs filed a motion to disqualify Barbara Moore as the hearing officer, which was denied. The plaintiffs claim a denial of due process, as Moore was also the Department employee responsible for preparing the tentative multiplier. While not questioning Moore's integrity or honesty, the plaintiffs contend Moore was biased toward validating her own prior work on the multiplier.

We consider that the decision of this court in *Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, requires the rejection of the plaintiffs' arguments. This court held in *Scott* that one attempting to disqualify a hearing officer must overcome a presumption of honesty and integrity by those serving as adjudicators and that generally, in the administrative law area, there is no denial of due process when one person combines the adjudicating and investigating functions. (84 Ill. 2d at 55-56.) The plaintiffs point to nothing in Moore's final report that casts doubt concerning her honesty or integrity; their due process argument must fail. As for the contention that the Department failed to certify a final multiplier and had certified instead the tentative multiplier, denying plaintiffs due process, we observe that again plaintiffs present no evidence to over-

come the presumption that all the agency's acts in connection with the multiplier were performed properly. (See, *e.g.*, *People ex rel. Wenzel v. Chicago & North Western Ry. Co.* (1963), 28 Ill. 2d 205.) Too, the Department did not revise or modify its tentative multiplier after the hearing, so that the "final" multiplier was actually the same as the tentative multiplier.

For the reasons given, the judgment of the circuit court, affirming the Department's determinations on the 1985 Cook County multiplier, is affirmed.

*Judgment affirmed.*

JUSTICE CALVO took no part in the consideration or decision of this case.